## MICHAELS ET AL. *v.* POST, ASSIGNEE.

1. Where one creditor has been induced by fraudulent representations of another creditor, who wishes to get into his own hands all the property of their common debtor, to release his debt, and the second creditor does so get the property, and thus obtains a preference, the creditor who has been thus, as above said, induced to release his debt, may disregard his own release, and petition that his debtor be decreed a bankrupt.
2. If on a petition and other proceedings regular in form a decree in bankruptcy is made in such a case, and an assignee in bankruptcy is appointed in a way regular on its face, the decree in bankruptcy, though it be a decree *pro confesso*, cannot, in a suit by the assignee to recover from the preferred creditor the property transferred, be attacked on the ground that the party petitioning had released his debt, was no creditor, that his petition was accordingly fraudulent, and that the decree based on it was void.

APPEAL from the Circuit Court for the Northern District of New York.

Post, assignee in bankruptcy of the Macary Brothers, filed a bill against Henry Michaels and Nathan Levi, partners, to make them account for the value of certain merchandise (an entire stock in trade, worth about $4200), which Post, as assignee, alleged that the said Macary Brothers had transferred to the said Michaels & Levi in fraud of the Bankrupt law.

The case, as it appeared on the weight of evidence, and as it was assumed by this court to be, was thus:

Harlow Macary and Henry Macary, two young men, aged respectively twenty-four and twenty-one years, sons of Adam Macary, began business under the name of Macary Brothers, as dealers in ready-made clothing, in August, 1868, at Hudson, Michigan; their father, who lived at Coldwater, a place about forty miles from Hudson, lending to them $2500. At this same place, Coldwater, there lived also a certain Louis Sloman; a brother-in-law of Henry Michaels, above named.

By the 25th of October, 1869, Macary Brothers had got a good deal in debt to other persons. The most important of their debts were: To Michaels & Levi, already named, $4600; Beir & Stern, $475; Sabey & Co., $368; Sloman & Rosenthal, $343; all these creditors residing at Rochester, New York, and being wholesale dealers in clothing. The debt to the father had been reduced to $2300, but this amount remained unpaid. They owed a few other small firm debts in their regular business.* Henry Macary, who carried on some little trading in cigars and tobacco, owed certain debts besides, the largest being to Mowry & Co., of Detroit, about $350, for which the brothers had given their joint notes and a chattel mortgage on their stock in trade.

In October, 1869, Michaels set off on a business tour through the West, and having passed through Coldwater, the place of his brother-in-law, Sloman's, residence, and stopped there a short time, arrived at Hudson on Friday, October 22d, 1869. He at once, on the afternoon of that same day, called at the store of the Macary Brothers, Henry Macary alone being at the store, Harlow being ill and at home. Michaels knew that the brothers Macary were indebted to other Rochester houses. He said to Henry Macary that he had come to Hudson to look over matters there a little between himself and the firm of Macary Brothers, and asked about how much stock there was on hand. Henry replied, between $5000 and $6000. Michaels said that he thought that there was not so much, and proposed to take an inventory at cost; a matter which Henry agreed should be done, and which

---

* Stated, *infra*, p. 408.

they did the next day. When the inventory had been taken, Michaels asked about the firm debts, and in a general way was told what they were. He then asked if he might look over the firm books, proposing to take them to the hotel where he was, with the inventory of stock as made out. This also Henry agreed that he might do. The next morning, returning to the store, he said, " You have about $4500 worth of goods." Henry replied, " We must have more." " The invoice figures no more," was the reply. " You have about enough to pay us." " Have you any proposition to make." Henry replied that he had no proposition to make until after he could consult with his brother.

The testimony of Henry, which was taken in the case, thus proceeded:

" He asked me, if he should throw us into bankruptcy, how much I thought each creditor would get. I told him I did not know. He said to me, 'Your father would get about ten cents on the dollar, and we would get about the same.' He said, ' Henry, I don't want any underhanded game undertaken with me.' I told him there was none; that the goods were all on the shelf, and that the books would show the accounts. He said, ' I don't want to injure you in any way or throw you out of business; but I see no way not to do it, unless I take the stock of goods and run the store myself until such time as I get my pay.' I told him, ' I would do nothing until my brother was present;' I think it was then near six o'clock; and he went to tea. About seven o'clock on the same day (the 23d) he came to the store and remained there till I closed it for the night. Before we closed it he said, ' I will look these books over more to-night, and you come to the hotel, at my room, to-morrow about two o'clock.' He then asked me if I had any objections to letting him have what money I had on hand, as it was best to make the amount I owed him as small as possible. I told him I had no objection, and handed him what money I had, $110. . I then closed the store and went home. I went to the hotel where he was the next day and saw him there. He asked me if I had any proposition then to make. I told him I had none. He asked me what we proposed to do. I told him I did not know what to do. He then said, ' I have a proposition to

make to you. It is that I shall buy the stock of goods and run
the store in a third party's name, leaving you and your brother
in the store. and to conduct the business the same as you have,
and pay the expenses of the store and remit the balance to me.'
He had before said, in this conversation, 'I will restock this
store with new goods and furnish you what goods are necessary
to conduct the business, and in the meantime I will have Ru-
dolph, my agent, find a better place for business than Hudson,
and after the first of January we will move the stock to the
place he shall select. I will restock the store with new goods
at that place, and you and your brother shall conduct the busi-
ness the same as you have done.' He then asked me how the
proposition suited me. I told him I did not know how that
would do, but if we were not thrown out of business, it was sat-
isfactory to me if the agreement was fulfilled. I then told him
that we would have to see my brother before anything was
done. Mr. Michaels and myself went to the house where my
brother was; went upstairs and saw him. Mr. Michaels told
him he had made a proposition to me, and we had come there
to talk with him about it. Mr. Michaels then stated the propo-
sition over to my brother as he had stated it to me. My brother
then asked him, in case we should sell the stock to him, what
would become of our other creditors, and what we 'should do in
case they should present their bills.' Mr. Michaels said, 'Pay
no attention to them; they can't do anything.' Mr. Michaels
then asked my brother who the third party should be. My
brother proposed the name of David Bovie, of Coldwater, Michi-
gan, who was master of our lodge. Mr. Michaels said, 'I do
not know him; it must be somebody that I know.' He said
'Louis Sloman, for instance.' He said, 'You know Louis; he
lives here, and he will do just as I tell him to.' My brother
said, 'I think we ought to have some choice in this matter.'
Mr. Michaels said, 'It don't make any difference what you think,
it must be as I want it.' My brother said, 'Does Louis Sloman
understand this, Mr. Michaels?' Mr. Michaels says, 'He does;
he will do just as I tell him.' Mr. Michaels said, 'Boys, I think
this is the best thing you can do, and you will think so too after
a little.' He then said, 'I think that one of you had better go
to Coldwater with me and see your father Monday, so that he
will understand it and will not make you any trouble, as he is
one of your creditors.' We then went to dinner. While at

dinner Mr. Michaels said, 'Boys, I think you will come out all right now. I have known cases a good deal worse than yours having come out all right.' That was all that was said till Monday, that I remember of now. Mr. Michaels asked my brother if he would be at the store Monday morning. He told him he would, about ten o'clock. Mr. Michaels went to the hotel.

"Monday morning, October 25th, 1869, Mr Michaels came to the store and returned the books. My brother, who was then there, asked him to restate the proposition he had made the day before. Mr. Michaels restated his proposition as he had stated it the day before. I think my brother then asked him what would be done with a chattel-mortgage of about $400 on the stock of goods that Mowry & Co., of Detroit, held on the goods. Mr. Michaels said he did not care anything about that; he would make that all right. Mr. Michaels then asked which one of us would go with him that afternoon to Coldwater. I asked my brother to go. He said to me, 'You had better go.' Mr. Michaels said, 'Henry, I think you had better go; I want you to go.' Mr. Michaels then asked my brother to give him a writing authorizing me to sign the firm-name to any transfer or sale of the stock of goods that might be made at Coldwater. My brother gave him the writing he required. Mr. Michaels then said to me, 'Telegraph to your father, so that he will be sure to be at home.' I did so telegraph my father. Mr. Michaels and I went to Coldwater that afternoon; we arrived between four and five o'clock. On our arrival Mr. Michaels said to me, 'You go home and get your father and come to Mr. Shipman's office, and I'll be there.' Mr. Shipman is an attorney. I left Mr. Michaels, went to my father's, and he and I went to Mr. Shipman's office together. We there found Mr. Michaels, and I introduced him to my father. Mr. Michaels then told my father that he had sent for him to talk with him about the matter between his (Michaels) firm and the firm of Macary Brothers. My father asked him what the difficulty was. Mr. Michaels said we were in a bad condition and he wanted to help us out; that he did not want to see us thrown out of business. My father then asked him what he proposed to do. Mr. Michaels told father he proposed to buy the stock of goods and run the store himself through a third party; that my brother and myself were to conduct the business the same as we had done; that

he would restock the store with such goods as were needed, and keep it stocked; that we should keep the store in Hudson till the 1st of January, and during this time he would have Rudolph, his agent, find a better place for business than Hudson was, and would then move the stock to such a place as Rudolph should select; that we were to receive the profits from the goods after expenses of the store had been paid, and he should receive his pay for the goods and we should have our living out of the profits on the sale of the goods. Mr. Michaels stated that we should go with the goods to this place and take charge of the business the same as we had done before. He then said to my father, in order to do this he (father) would have to withdraw his claim, so that he would not make us any trouble until such time as he, Mr. Michaels, had got his pay; then the stock should revert back to the firm of Macary Brothers, the same as it was before the sale was made. My father then said to Mr. Michaels, ' Ought I not to have some writing from you to show this?' Mr. Michaels said, ' That is not necessary, as I have always done by the boys, and always intend to, as I have agreed.' Mr. Michaels then asked me if I had confidence in him that he would do as he said—as he agreed to. I told him that I had. Father said if Mr. Michaels did as he agreed, it was all right. I think that was all that was said, till Mr. Shipman came in and drew up some writings. He drew up two or three writings. He read them over to Mr. Michaels. They did not suit Mr. Michaels, and Mr. Shipman tore them up. I think then Mr. Shipman said it was his tea-time, and we had better go to tea and come in after tea.

" After tea, my father and myself went back to Mr. Shipman's, and found Mr. Michaels and Mr. Shipman there. Mr. Shipman was writing a bill of sale. Mr. Shipman asked if the invoice that Mr. Michaels had should be the price of the goods. Mr. Michaels said, ' No, it will not look well; it will look as though we intended to defraud the other creditors.' Mr. Michaels said we had better make it seventy-five cents on a dollar, so that it would look as though we did not mean anything wrong. Mr. Shipman then finished the bill of sale, and also drew up a receipt for my father to sign.

" Mr. Michaels then said, ' I will go over to get Mr. Sloman to come over to the office;' and Mr. Sloman came to the office, and Mr. Shipman then read the bill of sale, and also the receipt,

and then the papers were signed. I signed the bill of sale, and father signed the paper prepared for him to sign."

That paper is thus:

" Macary Brothers, of Hudson, Michigan (who are my sons), being desirous of selling their stock of merchandise and goods in said place, to Louis Sloman, but the said Sloman being afraid of their creditors, to confirm said sale and his title, and in consideration that he should buy them out, I do hereby acknowledge receipt in full of all demands against the said Macary Brothers to this date, October 25th, 1869.                    " A. MACARY."

"Then there were three notes drawn up for six, nine, and twelve months. The price of the goods was divided into four equal parts, and the cash was one of these quarters, and the notes were of equal amount. Then Mr. Sloman signed the notes, and handed the notes and the money to Mr. Shipman. Mr. Shipman handed them to Mr. Michaels. Mr. Michaels did not take them; he said, 'Hand them to Henry (meaning me), and let him hand them to me.' Mr. Shipman handed the notes and the money to me, and I handed them to Mr. Michaels. Mr. Shipman then wrote a receipt. This interview after tea lasted about an hour. I returned to Hudson the next morning, Tuesday morning. On that day (Tuesday, October 26th, 1869) Mr. Sloman came to our store, and said that he had come to make out a list of what goods we needed, so as to send it to Mr. Michaels. My brother and Mr. Sloman looked through the stock, and made out a list of what goods we needed. Mr. Sloman made some proposition in regard to some goods he thought we ought to have, and Mr. Sloman took the list and went away. The value of the stock of goods on the 25th day of October, 1869, as nearly as I can estimate, was about $5000."

Harlow Macary, the other brother, was also examined. Confirming generally Henry's statement, so far as it related to matters in which he, Harlow, had been an actor, he added:

" My brother returned from Coldwater on Tuesday morning, early. Sloman came to Hudson on the same day. The first thing Sloman wanted to know, was, what we were going to do with the mortgage on the stock of goods. I told him I did not know, that we wanted to fix it some way. He said, 'Suppose you transfer your book-accounts to me towards it.' I transferred the book-

accounts to him.  I gave him also the proceeds of sales for part of the week.  He then wanted that I should turn over to him a cow that I owned.  I told him, ' No, sir; not so long as my name is Macary.'  Sloman then said, ' I propose to move this stock to Coldwater.'  I asked him, why.  He said he owned it. I asked him how he got it.  He said he bought it of Michaels. I asked him where and when.  He said in Coldwater, last Monday; meaning Monday, the 25th of October.  I told him that I did not understand it so.  He said that made no difference, and proposed to move that stock of goods that day.  He ordered myself and my brother to help his clerk to pack up the goods that day.  I told him there would be no goods packed that day in that store.  He told his clerk to go to packing up the goods. I forbid them both from touching a dollar's worth of goods, and the result was that Sloman demanded the goods, which I refused to grant, and subsequently I locked up the store; after which the sheriff broke open the store and took possession of the goods under a writ of replevin, and has held them ever since.  This replevin suit was in behalf of Sloman, as plaintiff, and the goods were delivered to him by the sheriff."

The father was examined also, and confirmed, so far as respected his action, what his son Henry had stated.

After Michaels and Henry Macary had agreed to go over to Coldwater, the former sent this telegram to his brother-in-law, Louis Sloman :

"HUDSON, October 25th, 1869.

" L. S.—Expect me next train.  Tell lawyer to be in office.
                                " H. MICHAELS."

Sloman accordingly met Michaels at the station.

After the deed of sale and other papers were executed at Coldwater, Michaels left the place; leaving it on the train of that night.  On reaching home he adjusted the claims of the other Rochester creditors, taking their discharges in full. None of them made any claim nor proved any demand in the bankruptcy proceedings.  Sloman paid Mowry & Co. Certain other creditors mentioned hereafter,* and having debts amounting in all to $304.08, proved them.

---

* *Infra,* p. 408.

Michaels himself and Sloman were also examined as witnesses. They did not disprove the leading facts stated by the Macary Brothers; that is to say, they did not disprove the fact of the debt due to Michaels & Levi, the insolvency of the brothers Macary; the visit of Michaels to Coldwater; his visit immediately afterwards to Hudson, and interview with the brothers Macary, and arrangements for a sale of the stock, and the extinction of the father's claim; the telegraphing to Hudson; the meeting in the office of the lawyer, Mr. Shipman, there; and the signing of papers, and the supposed conclusion of all these things. They omitted to state many incidents stated by the Macary Brothers, and toned down or changed the coloring which they gave to the leading facts testified to by them, and some minor matters, and all fraudulent motives they denied. But, as this court assumed on the evidence, the case in its great features stood.

In the state of things above described by these witnesses, Adam Macary, the father, on the 19th day of November, 1869, and of course after he had signed the paper on p. 404, releasing his debt, filed a petition in the District Court for the Eastern District of Michigan, representing himself still to be a creditor of the Macary Brothers for $2200; that they were insolvent, and that they had committed an act of bankruptcy by the sale of their property to Sloman; the same being alleged to have been done with an intent to give a preference to Michaels & Levi. The petition, which was set out in the case below, was regular in form, and assuming it to be true, made a plain case within the thirty-fifth section of the Bankrupt Act, quoted *supra*, p. 361. The Macary Brothers put in no defence, and were decreed bankrupts on the 1st of December, 1869, on their father's petition as aforesaid; and one Post was appointed their assignee in bankruptcy.

Post, as such assignee, now filed his bill in the court below against Michaels & Levi, to recover the value of the stock of goods assigned to Sloman, alleging that the sale was really to Michaels & Levi, or if not, that they got the benefit of it to the exclusion of other creditors, and were in

either case preferred within the meaning of the thirty-fifth section of the Bankrupt Act already referred to.

The defendants denied all the plaintiffs' allegations, generally and specifically:

Alleged that the sale was made to Sloman with the assent of Adam Macary, the father and petitioning creditor, and in consequence of his releasing his claim:

That Adam Macary, the party petitioning for a decree of bankruptcy, was in fact no creditor at all of his sons; that he had released his debt; that the court which had made the decree in bankruptcy accordingly had no jurisdiction in the case, the Bankrupt Act in its thirty-ninth section making, in terms, a decree of bankruptcy on the petition of a person other than the debtor legal only on the petition of one or more of the debtor's "*creditors*, the aggregate of whose debts, provable under the act, shall amount to at least $250:"

That the whole proceeding in the District Court was by collusion and fraud between the party calling himself the petitioner, creditor, and the so-called debtors, and therefore void; and that there were no other creditors who could have petitioned:

That if Michaels & Levi were guilty of any fraud, Adam Macary was a participant in it and could not profit by it.

On the hearing of the case, it was stipulated in open court by the parties as follows:

"Henry and Harlow Macary were adjudicated bankrupts on the 1st day of December, A.D. 1869, by the District Court of the United States for the Eastern District of Michigan, upon the creditor petition of A. T. Macary. Such adjudication was made in the ordinary manner upon default. Such proceedings were thereafter had that the complainant was on the 8th day of January, 1870, appointed assignee of said Henry and Harlow, and that he duly qualified as such, and entered upon the performance of the duties of said trust; that on the 13th of January, 1870, Hovey Clarke, register in bankruptcy, to whom said bankrupt proceedings were referred, executed and delivered to the complainant an assignment in due form, of all the estate and

effects of said bankrupts, a copy of which, duly certified, is produced on the hearing, to be read as evidence on said hearing, and filed in said cause; that debts have been proved before said register against said bankrupts as follows, viz.:

| | |
|---|---|
| F. B. Schermerhorn, of Hudson, for printing, | $93 48 |
| Miller & Co., Syracuse, cigars, | 58 75 |
| A Judson, Chicago, mittens and gloves, | 84 50 |
| Northrup & Richards, Bro'dalbin, N. Y., gloves, | 36 00 |
| Charles B. Northrup, Detroit, furnishing goods, | 31 35 |
| | $304 08" |

The court below adjudged that the defendants should pay the assignee the proceeds of the sale of the goods ($4213), with interest and costs, and be debarred from any dividend on the bankrupts' estate.

From this decree the defendants appealed.

*Mr. John Norton Pomeroy, for the appellants:*

I. *The decree in bankruptcy is void.*

1. On the 25th of October, Macary, the father, fully, legally, and finally surrendered and released all his claims and demands against his sons, and was not thenceforth, nor at the time of his filing the petition in bankruptcy against them, their creditor. The release then executed cannot be avoided. It states a legal consideration, and contains a release and discharge. It is not a mere receipt which can be explained; it is a contract based upon a valuable consideration, and can no more be avoided or disregarded than any other contract.

There were, in fact, two considerations. One, that mentioned in the instrument, the purchase, namely, by Sloman; and another not mentioned in it, but one which the testimony discloses as a thing which was to be done by Michaels, indeed a thing necessary to be done: the payment, namely, by Michaels of the Rochester creditors—creditors whose claims exceeded $1000, and to whom the Macary Brothers were to "pay no attention." These creditors Michaels did satisfy. The release, consequently, had a valuable consideration. The father, Macary, therefore, was not a creditor when he filed his petition to have his sons declared bankrupt.

Now, the fact that the petitioning creditor *is* an actual creditor of the intended bankrupts is a jurisdictional fact; it goes to the jurisdiction of the District Court to entertain the proceedings; and the absence of this fact is fatal to the validity of the adjudication and all that has been done under it.

It is not every debtor that can be made a bankrupt, and it is not every person that can institute bankruptcy proceedings. The party instituting must bring himself within the statutory requirements, not only in form but in fact, or else the very foundation of the proceeding fails. No one but a creditor can institute the proceedings, and even this creditor must hold a demand amounting to $250.

*In re Cornwall* \* Mr. Justice Woodruff declares this doctrine, and says:

"It would be monstrous injustice if parties were not only liable to be proceeded against, but must necessarily be adjudged bankrupt and dispossessed of all their property at the instance of any one and every one, who either dishonestly or by mistake was able to present a petition and affidavits, *prima facie* evidence of a debt, when in truth none existed."

2. The bankruptcy proceedings and the adjudication therein, under which the complainant derives his sole authority, were null and void, because they were instituted and obtained through fraud of the petitioning party, the father Macary, and by means of his wilful concealment of the truth from the District Court and his imposition upon it.

It was a fraud on the bankrupt court for the petitioner there to conceal the release and discharge of his demand which he had executed, and to represent that he was a creditor of his sons at all. To say the least, his conduct was highly uncandid and disingenuous towards the court. He knew that his sons would not put in an answer, and that there was no likelihood that the court would of itself suspect anything wrong, and set on foot an inquiry. If the bankruptcy court had been informed of the facts as they now

\* 6 Bankrupt Register, 305, 311.

appear, it certainly would not have granted the petition, *pro confesso*, as it did. It would have ordered evidence to be taken, and have cited parties to intervene. Such an attempt as the petitioner made to impose upon a court deserves to be visited with at least the punishment of a refusal to assist him, when he comes to ask the aid of equity.

3. The father was, upon his own showing and that of his son, a *particeps criminis* in all frauds which were committed or attempted by Michaels, acting for the defendants, whether the frauds were upon the Bankrupt Act or upon other creditors.

The theory of the complainant is that Michaels committed a fraud upon the act and upon other creditors. The father and both the sons tell this story: That there was a simulated sale to Sloman for the purpose of enabling the Macary Brothers to carry on the business exactly as they had done before, under the guise of a pretended ownership by Sloman; that all the other creditors were to be kept at bay by this means; that the sons were to buy of defendants as they had done, and were to have their living out of the business; that Adam Macary was informed of all this; and that knowing of this design, he took a part in it, assented to it, and gave a release of his own claim in order to help it along, which release he now insists was a mere sham and falsehood.

4. It is a patent fact that the bankruptcy proceedings were instituted for the direct benefit of Macary, the father, and his sons; and to lay the foundation for the present suit against Michaels & Levi.

The list of creditors contained in the schedules filed by the bankrupts and that of the creditors who have proven their claims, shows the nature of the original proceeding and of this suit. None of the important creditors named in the schedules have proved their claims except Macary, the father. The Rochester creditors have been all settled with. Mowry & Co. were paid off by Sloman; the defendants were not put in the schedules. Of the five creditors who proved their claims, one is for $93, another for $84, and the others for $58, $36, and $31. There is not a creditor unsettled with

who could have instituted bankruptcy proceedings. Both father and sons are directly benefited by the original proceedings and by this suit. The case is one of palpable collusion between them. The case, in short, is this: Michaels & Levi pay the creditors and lose their own debt; the father gets paid in full the claim which he had surrendered; and the sons, utter bankrupts, are discharged from all liability and come out rich men, with a large balance which their father leaves after paying what he claims.

5. We are not *here* denying that the arrangements made between the parties were a fraud on the Bankrupt Act, and that under the thirty-fifth and thirty-ninth sections of the act they could have been set aside by any creditor, other than Macary, whose debt amounted to $250. What we assert is this: that in view of the facts of the case and of the considerations which we have just above presented, *Adam Macary* could not come in and do it. And whether or not *he* could, is, we submit, the narrow question before the court.

II. *The decree can be attacked as we attack it.*

The only reply to what we have said, we suppose, will be that the decree in bankruptcy being regular on its face, it cannot be attacked collaterally.

In regard to this we say:

1. In the case of tribunals of mere statutory jurisdiction, even if the record aver the existence of facts which are necessary to give jurisdiction, this averment is only *primâ facie* true. The record and judgment may be impeached by a collateral attack and in a defensive attitude or proceeding, by showing that such facts did not exist. This doctrine was fully asserted by this court in *Thompson* v. *Whitman.** And the rule applies alike to the decisions *in rem* and to decisions *in personam* between the parties. Indeed, in those special and general statutory cases where the inferior tribunal is obliged to pass and does pass upon the existence of the very

---

* 18 Wallace, 457; and see 2 American Leading Cases, note to Mills *v.* Duryee, pp. 786, 788, 789, 792; 2 Smith's Leading Cases, Duchess of Kingston's case, pp. 438, 446 (marginal paging).

jurisdictional facts which must exist in order that it may have power to decide at all, even here its decision is not conclusive upon the question of jurisdiction.   The rule applies in this instance also.   No inferior court can, in the language of some of the books, make its own jurisdiction by deciding that it exists.   And the doctrine applies even in those peculiar cases *where the jurisdictional facts and the facts on the merits are identical.**

· There are, indeed, a few cases, such as *Brittain* v. *Kinnaird*,† *Colton* v. *Beardsley*,‡ and *Wright* v. *Douglass*,§ which might perhaps be cited to prove that when the jurisdiction of an inferior tribunal depends upon a fact which such court is required to ascertain and determine by the decision, such decision is final until reversed in a direct proceeding for that purpose.   But the first of these cases has been directly overruled in *Ex parte Clapper*,‖ as also in *Broadhead* v. *McConnell*,¶ and the point is not decided in the two others.   The remarks in them favoring the idea which we controvert, were mere *dicta.*

2.   An adjudication of bankruptcy being a decree *in rem,* may be impeached by a stranger to it by his showing, either in a direct proceeding or by collateral attack and by way of defence, that it was obtained through fraud and by imposition on the court.

It is familiar equity doctrine that a judgment of any court may be attacked and set aside on the ground that it was procured through fraud practiced upon the court by the party promoting the proceedings.**

---

* 1 Smith's Leading Cases, *ut supra,* pp. 999, 1003; Thompson v. Whitman, 18 Wallace, 457, 468; Kerr v. Kerr, 41 New York, 272; Clark v. Holmes, 1 Douglass (Michigan), 390, 397–400; Sears v. Terry, 26 Connecticut, 273, 279, 280, 282, 285; Brown v. Foster, 6 Rhode Island, 576, 577, 578.

† 1 Broderip & Bingham, 432.

‡ 38 Barbour, 29, 51, per Rosekrans, J.

§ 10 Id. 97, 110, 111, per Gridly, J.

‖ 3 Hill, 460.                    ¶ 3 Barbour, 185.

** Dobson v. Pearce, 12 New York (2 Kernan), 164, 165; 2 Phillips on Evidence, 4th ed., p. 47; Story's Equity Jurisprudence, §§ 252, 252a, 1570, 1575, 1581, 1582 (Redfield's Ed.); Greenleaf on Evidence, § 541.

Mr. Justice CLIFFORD delivered the opinion of the court.

Debtors, owing debts to the amount of $300, who have committed any one of the acts of bankruptcy enumerated in the thirty-ninth section of the original Bankrupt Act, may be adjudged bankrupts on the petition of one or more of their creditors, the aggregate of whose debts provable under the act amounts to $250, provided such petition is filed within the period therein prescribed.

By that section it is declared to be an act of bankruptcy if such a debtor shall make any assignment, gift, sale, conveyance, or transfer of his estate, property, rights, or credits, with intent to delay, defraud, or hinder his creditors, or if, being bankrupt or insolvent, or in contemplation of bankruptcy or insolvency, he shall make any payment, gift, grant, sale, conveyance, or transfer of money or other property, estate, or credits, with intent to give a preference to one or more of his creditors; and the provision is that if such a debtor shall be adjudged a bankrupt the assignee may recover back the money or other property so paid, conveyed, sold, assigned, or transferred contrary to that provision, provided the person receiving such payment or conveyance had reasonable cause to believe that a fraud on the Bankrupt Act was intended, or that the debtor was insolvent; and the further provision is that such creditor shall not be allowed to prove his debt in bankruptcy.*

Proof, of the most satisfactory character, is exhibited in the record that the debtors described in the bill of complaint were, on the 1st day of December, 1869, adjudged, by the District Court of the United States for the district where the debtors resided, to be bankrupts, on the petition of the creditor therein named, and that such proceedings subsequently took place that the complainant was duly appointed the assignee of their estate.

Argument to support those allegations is unnecessary, as they were admitted in open court, and it is equally clear that the assignee was duly qualified and that all the estate,

---

* 14 Stat. at Large, 536.

real and personal, of the bankrupts was duly assigned and conveyed to the assignee, as required and directed by the fourteenth section of the Bankrupt Act. Nor is any discussion of those matters necessary, as they also were admitted at the hearing in the Circuit Court.

Abundant proof is also exhibited to show that the bankrupts, prior to the commencement of the proceedings in bankruptcy, were engaged in business as retail traders, and that they were largely insolvent; that the principal means they possessed, either to pay their debts or to support their families, consisted of a stock of clothing, hats, caps and other furnishing goods for gentlemen, not much exceeding in value the sum of $4000, and that they sold and conveyed the whole of their stock of goods, on the 25th of October preceding the date of the decree by which they were adjudged bankrupts, at the instigation and for the exclusive benefit of the appellants, who were their largest creditors.

Such sale and conveyance having been made less than a month and a half before the vendors were adjudged bankrupts, the assignee claimed that the sale and conveyance were null and void, and that the attending circumstances were such that it became and was his duty, as such assignee, to take proper measures to cause the goods or their proceeds to be restored, as belonging to the estate of the bankrupts, and to procure, if practicable, a decree that the purchasing creditors should not be allowed to prove their debt against the estate of the bankrupts.

Pursuant to that view the complainant instituted the present suit, in which he alleges, among other things, that the appellants held demands against the bankrupts exceeding $4000, and that the appellants becoming fearful that they should lose their claim, and being anxious to have the same paid or secured, they, or one of them in behalf of the firm, made a visit to the bankrupts at their place of business, and that while there they took an inventory of their stock of goods and proposed to buy them out and leave the goods in the store of the vendors, and permit them to continue their business and to sell the goods for the vendees at such prices

as they, the vendors, could get for the same, and to account to the vendees at the prices which they, the vendees, should mark the goods at the time of the sale, with the right on the part of the vendors to keep the balance for their commissions in selling the goods; that the respondents also proposed, as the complainant alleges, in order to induce their debtors to consent to the proposed arrangement, that they, the respondents, would furnish them additional goods to sell, on the same terms, as they, the debtors, should need thereafter to keep up their stock; and the further allegation is that the respondents also suggested that, in order to have the transaction " look all right," it would be better to have the goods transferred to some third person, naming the one to whom the goods were subsequently conveyed for their benefit.

Objections were at first made by the debtors, but they finally acceded to the proposal, and assigned and transferred their entire stock of goods to the person named by the respondents, he, the nominal grantee, paying therefor the sum of $4000 in money, drafts, and his promissory notes, all of which were immediately handed over to the persons for whose benefit the sale and purchase were made, and that they gave to their debtors a receipt in full of all demands.

Beyond all doubt the debtors expected to remain in the possession of the goods and to be permitted to sell the same on commission, but the complainant alleges that the nominal vendee in a few days thereafter, acting under the advice and instructions of the real purchasers of the goods, made a demand of the same from the debtors, and that the latter having refused to surrender the possession, the person who made the demand sued out a writ of replevin against the debtors in possession, and succeeded in recovering the goods, which, with a few outstanding accounts, constituted the entire property of the debtors, and that the taking away the said goods from them as aforesaid left them stripped of all means of paying their other creditors, to whom they were largely indebted, and several of whom have since proved their claims against the estate of the bankrupts.

Prefaced by these allegations the complainant charges in

the bill of complaint that the entire transaction of the pretended sale and transfer of the goods and of the payment of the price by the money and notes, was but a *scheme* on the part of the respondents to obtain a preference over other creditors within four months before the petition in bankruptcy was filed, in violation of the express provisions of the Bankrupt Act, and that the respondents knew all about the pecuniary condition of the debtors, and knew that their assets were not equal in value to their indebtedness, and that they were insolvent.

Superadded to that the complainant also charges that the sale and transfer of the goods and the turning over of the money and notes to the respondents were not made and done in the ordinary course of the business of the debtors, and that the respondents had reasonable cause to believe at the time of the transaction that the pretended sale and transfer were made in fraud of the provisions of the Bankrupt Act. Wherefore the complainant prays that the sale and transfer may be decreed to be, in effect, a sale and transfer to the respondents, and if not, that they may be decreed to account to him, as such assignee, for the money and notes so turned over and transferred to them as aforesaid, and that the respondents may be decreed to have lost any and all claim to any share or dividend in the estate of the bankrupts.

Service was made and the respondents appeared and filed an answer, as follows: (1.) They deny each and every of the allegations and statements of the answer. (2.) They allege that the vendee of the goods made the purchase of the debtors without any intention of defrauding, or in any way or manner affecting, the creditors of the vendors, and without any knowledge or information that the owners of the goods had any other creditors that could in any way be affected by the said purchase, and that the purchase was made by him with the consent and approbation of the petitioning creditor in the bankrupt proceedings. (3.) That the proceedings in bankruptcy were void and of no effect, and that they were collusive and a fraud upon the Bankrupt Act;

that the petitioner in the case was not, in fact, a creditor of the bankrupts, and that the proceedings were instituted and prosecuted at the request and in the interest of the bankrupts, and with their consent, contrivance, and approbation, and by collusion with them. (4.) That the proceeds of the sale were paid over to the bankrupts, and were received by them, with the consent and approbation of the petitioning creditor, who is their father, and that he was present and consented to all that was done in respect to the sale of the goods and the disposition of the proceeds, and they deny that there are other creditors who would or could institute such proceedings against the bankrupts.

Evidence was taken on both sides and the parties were fully heard, and the Circuit Court entered a decree for the complainant, as follows : (1.) That the complainant recover of the respondents, principal and interest, the sum of $4213.69 and costs of suit. (2.) That the respondents be, and they are hereby, adjudged to have lost any and all claim to any share or dividend in the property of said 'bankrupts, or in any property, money, or effects obtained or to be obtained by the complainant by this decree, or from any share in the estate of the bankrupts in the hands of the complainant, as such assignee.

Subsequently a final decree was entered and the respondents appealed to this court. Since that time the appellants have appeared and filed the following assignment of errors: (1.) That the Circuit Court erred in adjudging that the complainant recover of the respondents the sum mentioned in the decree, or any sum whatever. (2.) That the said court erred in adjudging that the appellants be debarred from any share in the estate of the bankrupts. (3.) That the said court erred in not deciding that the proceedings in bankruptcy were wholly void and of no effect, on the ground that the District Court had no jurisdiction of the petition, because the petitioner was not a creditor of the bankrupts. (4.) That the said court erred in not deciding that the bankrupt proceedings were wholly void and of no effect, on the ground that the proceedings were fraudulently instituted

and prosecuted. (5.) That the said court erred in deciding that the goods were transferred to the appellants in a manner to constitute a violation of any provision of the Bankrupt Act.

Viewed in the light of the assignment of errors, the objections to the decree of the Circuit Court embody three affirmative propositions, as follows: (1.) That the proceedings in bankruptcy were void and of no effect for the reasons which are set forth in the third and fourth assignments. (2.) That the decree is in favor of the wrong party, for the reasons set forth in the first and fifth assignments of errors. (3.) That the proofs did not warrant the court in adjudging that the respondents should be debarred from any share in the bankrupts' estate.

I. Even a slight examination of the transcript will be sufficient to show that neither of the alleged errors is apparent in the record of those proceedings, nor is there anything apparent in the record which affords any support whatever to either of the alleged objections. Instead of that the record shows that the petition in bankruptcy was in due form, and that all the proceedings antecedent to the decree adjudging the debtors to be bankrupts were regular and in strict conformity to the Bankrupt Act; nor is it pretended that there was any irregularity in the proceedings which led to the appointment of the assignee, or in his administration of the bankrupts' estate, or in the assignment and conveyance of the same to him as required and directed by the fourteenth section of the Bankrupt Act.

Such an objection, if made, could not be sustained, as the petition in bankruptcy is set forth at large in the transcript, and it was admitted by the respondents, in open court, that the debtors, on the day heretofore named, were adjudged bankrupts by the said District Court, upon the petition of the creditor named in the petition, and the express admission is that the adjudication was made, in the ordinary manner, upon default, and that an assignment of their effects was made, in due form, to the assignee. Every pretence, therefore, that there is any such error apparent in

the record is foreclosed by the stipulation contained in the transcript.

Attempt is made in argument to maintain the first proposition by reference to the evidence reported in the record, but it is clear that the parts of the evidence referred to, when properly understood, afford no countenance to any such theory. What the respondents assume is that the evidence warrants the conclusion that the insolvents were not indebted to the petitioning creditor, and that the proceedings in bankruptcy were instituted and prosecuted by the petitioner in collusion and with the consent and approbation of the insolvent debtors, but it is demonstrable that a proper analysis and construction of the parts of the evidence invoked to sustain that issue will show that the whole theory is utterly destitute of any foundation.

Unexplained it may be admitted that the act of the petitioning creditor in discharging his claim against his sons at the time the respondents purchased their stock of goods would afford some support to the assumed theory, but it is quite obvious that the evidence of that act, when weighed in connection with the attending circumstances, proves the very reverse of the theory it is invoked to support. Sufficient appears in the circumstances under which that discharge was given to show that it was procured by the false representations and the gross fraud and deception of the respondents, or of the senior partner of their firm, and that he was acting for the benefit of his partner as well as of himself.

By the pleadings and proofs it appears that the respondents are wholesale clothing merchants, doing business in Rochester, in the State of New York, and that the insolvent debtors mentioned in the bill of complaint, prior to the sale of their stock of goods to the respondents, were retail traders engaged in business at Hudson, in the State of Michigan, owning a stock of goods consisting of such articles of merchandise as those before mentioned, of the value of $4000. They owed the respondents $4500 and were largely in debt to other creditors, amounting in the whole, as estimated by the senior partner of the respondent firm, to the sum of

$8000. Prior to the sale of their stock of goods to the respondents, or about the time they commenced business, they borrowed $2500 of their father, no part of which was ever paid, except the sum of $300 of the principal.

Enough appears to show that the respondent firm became fearful that their debtors would not be able either to pay their debts or to continue their business, and that it was very desirable to enforce payment or to procure security. Doubtless it was such motives that induced the senior partner to make a trip to the place where the insolvent debtors were doing business. Before going there, however, he made a short visit to his brother-in-law, who resides forty miles beyond the place where his insolvent debtors lived. As shown in the proofs, on his return he called at the store of his debtors, the elder of the two being present, the other being sick at his dwelling-house. Conversation ensued in respect to the pecuniary condition of the debtor firm, and the creditor informed the partner present that he came to look over their matters, and he was permitted to examine the goods on hand and to look over their books. Estimates were made by each of them as to the value of the stock, and as they differed in opinion as to its value, they concluded to make an inventory of the same, which was done, and they also computed the debts of the debtor firm and found that their indebtedness amounted to $8000, including the amount due to their father. Having completed the examination of the goods and of the books, the respondent remarked that they had got only four or five thousand dollars to pay their whole indebtedness, amounting to $8000, and added to the effect that if they did not pay he should remain, and on Monday would throw them into bankruptcy. He did remain, and on the following day (Sunday) dined with his debtors at their dwelling-house, the junior member of the firm being still confined to the house. Monday came, but he did not attempt to institute proceedings in bankruptcy but proposed that they should sell their whole stock of goods to some third person, to be named by him, for the benefit of his firm, and to induce the debtors to accept the

proposal he accompanied it with the assurance that they, the debtors, should remain in possession of the goods, as the agents of the purchasers, to sell the goods on commission, as alleged in the bill of complaint, and that his firm or their agent, the nominal purchaser, would, from time to time, furnish them with additional goods to replenish their stock, to be held and sold by the insolvent debtors on the same terms.

Embarrassed as the owners of the goods were, they were pretty easily persuaded by the threats of the respondent and by the false and fraudulent promises and assurances, made in behalf of the respondents, to accept the deceptive, alluring, and fraudulent proposals. Objections, indeed, were at first made by the owners of the goods, and one of them inquired of his wily creditor what they should do when their other creditors presented their bills for payment; but the artful negotiator soon silenced every misgiving of that sort by the fraudulent suggestion, as follows: "Pay no attention to them; they can't collect anything."

Difficulties in that quarter having been overcome, it only remained to dispose of the debt which the young men owed to their father. Expedients to accomplish that end were soon devised by the unscrupulous creditor. He advised the young men to communicate with their father, and that he and they, or one of them, should immediately go to the place of the father's residence in order to induce him to relinquish his claim, so that the proposed arrangement could be safely carried into effect. Measures were immediately adopted to notify the father and the brother-in-law of the respondent, who resided in the same place, of their intended visit, for which purpose the respondent sent a telegram to his brother-in-law, of the following terms: "Expect me next train. Tell the lawyer to be in his office." Information of the intended visit was also communicated to the father by the elder son, who was authorized to act for his partner as well as for himself.

On their arrival at the depot of the place of destination they were met by the brother-in-law of the respondent, who

had previously been designated as "the third person" to whom the stock of goods was to be conveyed. Notice of their arrival was given to the father by his son, and they went immediately to the office of the attorney-at-law, referred to in the telegram sent by the respondent, and there they met the respondent and his brother-in-law.

Nothing remained to be done to render the scheme successful except to dispose of the debt of the father. Plausible arguments to promote that purpose were presented by the respondent. He commenced the conversation by artful explanations to show that the arrangement suggested was essential to save the insolvent debtors from ruin, saying that the boys were in a bad condition; that he was anxious to help them; that he did not want to see them thrown out of business.

Inquiry was then made of him by the father of the debtors, what he proposed to do; to which he promptly replied to the effect following: that he proposed to buy the stock of goods and run the store himself, through a third party, retaining the young men to conduct the business the same as they had done; that he and his partner would restock the store with such goods as they should need, and keep it stocked for the time proposed to the debtors, and repeated all the promises and assurances previously made and given to the insolvent debtors, among which were the promise and assurance that the debtors should remain in possession of the goods and be constituted the agents of the purchasers to sell the same, and that they should receive to their own use the net profits of the sales, and should also have their living out of the business.

Beyond all doubt these insidious remarks were intended as an introduction to the proposition to be made to the father of the debtors, which was that in order to effect the arrangement it would be necessary that he should withdraw his claim, so that the purchasers would not be exposed to any trouble in carrying out the proposal, until they should get their pay, when the goods should revert to the debtors. Alluring and plausible as these suggestions were to the father

of the insolvent young men, still he inquired in reply whether he ought not to have some writing to insure the performance of the stipulations on the part of the purchasers of the goods, but the respondent immediately remarked that nothing of the kind was necessary; that he had always done by the boys as he agreed and always intended to do so.

Suffice it to say that the colloquy was continued for some time, during which one or two writings were drawn, which were destroyed because they were not satisfactory, and the negotiation terminated in the adoption of the original proposal made by the respondent, without any writing being given to secure the promises and assurances given, either to the father or the owners of the stock of goods. They, the owners of the goods, executed a bill of sale of the same to the brother-in-law of the respondent, the price being fixed at $3482.34, and he paid the consideration by a draft for $500, a check for $170.59, cash $200, and three notes signed by the nominal purchaser, each for the sum of $870.60. Care was taken at the time that the whole consideration, including the draft, check, money, and notes, should be delivered to the representative of the insolvent debtors, but the evidence shows that he, the debtor, immediately passed over the whole amount to the respondent, who gave a discharge of the debt of his firm. By this contrivance the respondent, through his brother-in-law, became the purchaser of all the stock in trade belonging to the insolvent debtors, which he accepted as a full payment of the debt due to his firm. Agreeably to the arrangement the father of the debtors also withdrew his claim and executed a discharge to his sons for the same without being paid even to the amount of a dollar.

Steeped in fraud as the transaction was, the court here does not hesitate to decide that the discharge procured from the father of his debt against his sons is null and void, and that when he found that all the promises and assurances made and given by the respondent were broken, and that they were evidently never intended to be performed, he had a right to regard his debt as in full force. Proof of a more

satisfactory character to establish that proposition can hardly be imagined than that which is exhibited in the record.

Before the week elapsed the nominal purchaser of the goods visited the bankrupts at their place of business, and pretending that he had been deceived by them in respect to a lien on the goods, procured from them an assignment of their books, and failing to induce them to turn over to him the only cow they owned, he demanded the goods, and the debtors having refused to deliver the same, he sued out a writ of replevin and took the same into his possession, leaving them stripped of everything except the cow, which they refused to convey.

Examined in connection with the attending circumstances it is manifest that the discharge of the debt procured from the father is null and void, because it was obtained by gross deception, misrepresentation, and shameless fraud. Mingled threats and promises induced the insolvent debtors to accept the proposal of the respondent, and every candid and impartial investigator of the facts given in evidence must admit that it was the same appliances strengthened by the desire of the father that his sons might be able to continue in business that induced him to execute the discharge. Twenty-two hundred dollars of the principal lent by him to his sons were still due to him, and he was not paid one dollar for the discharge on the occasion. Nor is there any better foundation for the charge that the proceedings in bankruptcy were instituted and prosecuted in collusion with the bankrupts and with their consent and approbation, as the charge is not supported by any satisfactory evidence.

II. Suppose that is so, still it is insisted that the complainant is not entitled to maintain the suit because the decree adjudging the debtors to be bankrupts was procured by fraud.

Support to that proposition is not found in any defect in the decree of the District Court where it was entered, nor in any of the proceedings which led to it, nor is any reference made in the assignment of errors to the evidence invoked to establish the proposition, unless it be to the charge

that the insolvent debtors were not indebted to the petitioning creditor, which has already been shown to be without any just foundation.

Defects of the kind should be specifically pointed out, and if they consist of matters of fact, the evidence to support the assignment should be the subject of distinct reference; but the court is not inclined to rest the decision upon any imperfections in the assignment of errors. Influenced by that determination the whole evidence reported has been examined, and our conclusion is that the proposition is not proved. Nor is the court inclined to stop there, as we are all of the opinion that the decree of the District Court in such a case is conclusive of the fact decreed, unless when it is called in question in the court where it was entered or by some direct proceeding in some other court of competent jurisdiction.

Jurisdiction is certainly conferred upon the District Court in such a case, if the petition presented sets forth the required facts, and the court upon proof of service thereof finds the facts set forth in the petition to be true; and it is equally certain that the District Court has jurisdiction of all acts, matters, and things to be done under and in virtue of the bankruptcy until the final distribution and settlement of the estate of the bankrupt and the close of the proceedings.

Power, it is true, is vested in the Circuit Courts in certain cases to revise the doings of the District Courts, and in certain other cases an appeal is allowed from the District Court to the Circuit Court, but it is a sufficient answer to every suggestion of that sort that no attempt was made in this case to seek a revision of the decree in any other tribunal. Nothing of the kind is suggested, nor can it be, as the record shows a regular decree, unrevised and in full force.

Grant that and still the proposition is submitted that it may be assigned for error that it was procured by fraud, and that such an assignment is valid, even though the decree was introduced as collateral evidence in a suit at law or in equity. But the court here is entirely of a different opinion,

as the District Courts are created by an act of Congress which confers and defines their jurisdiction, from which it follows that decrees rendered in pursuance of the power conferred are entitled in this court to the same force and effect as the judgments or decrees of any domestic tribunal, so long as they remain unreversed or not annulled.*

Foreign judgments, by the rules of the common law, were only *primâ facie* evidence of the debt adjudged to be due to the plaintiff, and every such judgment was open to examination, not only to show that the court in which it was rendered had no jurisdiction of the subject-matter, but also to show that the judgment was fraudulently obtained. Domestic judgments, under the rules of the common law, could not be collaterally impeached or called in question if rendered in a court of competent jurisdiction.† It could only be done directly by writ of error, petition for new trial, or by bill in chancery.‡ Third persons *only*, says Saunders, could set up the defence of fraud or collusion, and not the parties to the record, whose only relief was in equity, except in the case of a judgment obtained on a cognovit or a warrant of attorney.§

Judgments of any court, it is sometimes said, may be impeached by strangers to them for fraud or collusion, but the proposition as stated is subject to certain limitations, as it is only those strangers who, if the judgment is given full credit and effect, would be prejudiced in regard to some pre-existing right who are permitted to set up such a defence. Defences of the kind may be set up by such strangers. Hence the rule that whenever a judgment or decree is procured through the fraud of either of the parties, or by the collusion of both, for the purpose of defrauding some third person, such third person may escape from the injury thus attempted

---

* Parker *v.* Danforth, 16 Massachusetts, 299; Pecks *v.* Barnum, 24 Vermont, 76; 2 Smith's Leading Cases, 7th edition, 814.

† Lord *v.* Chadbourne, 42 Maine, 429.

‡ Cammell *v.* Sewell, 3 Hurlstone & Norman, 617.

§ 2 Saunders on Pleading and Evidence, part 1, p. 63; Christmas *v.* Russell, 5 Wallace, 304.

by showing, even in a collateral proceeding, the fraud or collusion by which the judgment was obtained.*

Third persons only, however, can set up such a defence, as the rule is well settled that neither the parties nor those entitled to manage the cause or to appeal from the judgment are permitted to make such defence in any collateral issue.†

Unquestionably a judgment may be impeached for the purpose of showing that it was procured by the debtor for the purpose of avoiding the operation of the Bankrupt Act. Evidence for that purpose is admissible to show—(1.) That it was procured within four months prior to filing the petition in bankruptcy, and with a view of giving the plaintiff a preference over the other creditors. (2.) That the debtor was insolvent at the time. (3.) That the plaintiff had at the time reasonable cause to believe that the defendant was insolvent, and that he procured the judgment to give the plaintiff such a preference.‡

Competent evidence is admissible to prove those facts, but a judgment is no more liable to collateral impeachment in proceedings under the Bankrupt Act, except for the purpose of showing that the judgment in question was designed as a means of avoiding the equal distribution of the debtor's estate among his creditors, than it is to such impeachment in the courts where it was rendered.§

Power to establish uniform laws upon the subject of bankruptcy throughout the United States is conferred upon Congress, and Congress having exercised the power it has be-

---

* Crosby v. Leng, 12 East, 409; Insurance Co. v. Wilson, 34 New York 281; Hall v. Hamlin, 2 Watts, 354; Pond v. Makepeace, 2 Metcalf, 116; Sidensparker v. Same, 52 Maine, 488.

† Homer v. Fish, 1 Pickering, 435; Railroad Co. v. Sparhawk, 1 Allen, 448; Atkinson v. Allen, 12 Vermont, 624; Granger v. Clark, 22 Maine, 130; Hammond v. Wilder, 25 Vermont, 346; Coit v. Haven, 30 Connecticut, 198; Hollister v. Abbott, 11 Foster, 448; 2 Philips on Evidence, 80, note 291 (5th Am. ed.); Christmas v. Russell, 5 Wallace, 306; Peck v. Woodbridge, 3 Day, 30.

‡ Buchanan v. Smith, 16 Wallace, 277; Wager v. Hall, 16 Id. 590.

§ Palmer v. Preston, 45 Vermont, 159.

come an exclusive power. By the act of Congress the juris-
diction to adjudge such insolvent debtors as are described in
the thirty-ninth section of the act to be bankrupts is vested
in the District Courts, and it follows that such a judgment
is entitled to the same verity, and is no more liable to be
impeached collaterally than any other judgments or decrees
rendered by courts possessing general jurisdiction, which of
itself shows that the case before the court is controlled by
the general rule that where it appears that the court had
jurisdiction of the subject-matter, and that the defendant
was duly served with process or voluntarily appeared and
made defence, the judgment is conclusive and is not open to
any inquiry upon the merits.*

Exactly the same rule is applicable to the case before the
court, as it is clear that the District Court had jurisdiction
of the petition and that there is not even a suggestion that
the notice required by law was not given as the law directs.†

Such a decree adjudging a debtor to be bankrupt is in the
nature of a decree *in rem* as respects the *status* of the party,
and in case the court rendering it has jurisdiction it is only
assailable by a direct proceeding in a competent court, if
due notice was given and the adjudication is correct in
form.‡

III. Preferences as well as fraudulent conveyances, if
made within four months before the filing of the petition
by or against the bankrupt, are forbidden by the Bankrupt
Act; but three things must concur in order that the transac-

---

* 2 Smith's Leading Cases (7th ed.), p. 622; Freeman on Judgments (2d
ed.), sec. 606; Hampton *v.* McConnel, 3 Wheaton, 234; Nations *v.* Johnson,
24 Howard, 203; D'Arcy *v.* Ketchum, 11 Id. 166; Webster *v.* Reid, Ib. 460.

† In re Robinson, 6 Blatchford, 255; Wimberly *v.* Hurst, 33 Illinois, 172;
Corey *v.* Ripley, 57 Maine, 69; Ocean Bank *v.* Olcott, 46 New York, 15;
Fortman *v.* Rottier, 8 Ohio State, 556; Revell *v.* Blake, Law Reports, 7 C. P.
308.

‡ Way *v.* Howe, 108 Massachusetts, 503; Ex parte Wieland, Law Reports,
5 Chancery Appeals, 489; Woodruff *v.* Taylor, 20 Vermont, 65; Mankin *v.*
Chandler, 2 Brockenbrough, 126; Shawhan *v.* Wherritt, 7 Howard, 643,
Imrie *v.* Castrique, 8 C. B., New Series, 407; Carter *v.* Dimmock, 4 House of
Lords Cases, 346.

tion may come within the prohibition and be affected by it as an illegal payment, security, or transfer: (1.) That the payment, pledge, assignment, transfer, or conveyance was made by the bankrupt, within the period mentioned, and with a view to give a preference to one or more of his creditors, or to a person having a claim against him, or who was under some liability on his account. (2.) That the person making the payment, pledge, assignment, transfer, or conveyance was insolvent or in contemplation of insolvency at the time the preference was secured. (3.) That the person receiving such payment, pledge, assignment, transfer, or conveyance, or to be benefited thereby, had reasonable cause to believe that the person was insolvent and that the payment, pledge, assignment, transfer, or conveyance was made in fraud of the provisions of the Bankrupt Act.*

Creditors are forbidden to receive such a preference from such a debtor, and the provision is that if such a debtor shall be adjudged a bankrupt the assignee may recover back the money or other property so paid, conveyed, sold, assigned, or transferred contrary to that act, provided the person receiving such payment or conveyance had reasonable cause to believe that a fraud on the Bankrupt Act was intended, or that the debtor was insolvent; and the farther provision is, that such creditor shall not be allowed to prove his debt in bankruptcy.†

Evidently that part of the decree which is the subject of the third complaint is founded upon that provision, and inasmuch as the facts exhibited in the record bring the case in all respects within the regulation there prescribed, it is clear that it was competent for the Circuit Court to render such a decree, and the court here sees no reason to question the action of the Circuit Court.

　　　　　　　　　　　　　　　　　　DECREE AFFIRMED.

---

* Wager *v.* Hall, 16 Wallace, 595; Scammon *v.* Cole, 5 National Bankruptcy Register, 259.

† 14 Stat. at Large, 536.